Good morning, your honors. My name is Randy Hironaka. I represent defendant appellant John Penitani in this hearing. The evidentiary hearings on the 2255 had had many issues that were testified about and there were multiple issues that were also briefed in this Ninth Circuit appeal. So in preparing what I wanted to do was actually kind of focus to what I think is the issue that this issue in this case which is the concurrent conflict of interest which existed based upon Mr. Briner's violation of Hawaii rules of professional conduct rule 1.7a. I have a question about that. Do you mind if I jump in? Sure. Do you think that the district court understood the rule or perhaps the opposing counsel's briefing the rule to require concurrent representation of clients? So that's where I was going is that basically the conclusion that there wasn't an issue with respect to the joint or concurrent or multiple representation because it strictly limited its analysis to that two-month overlapping period when Mr. Briner represented both Mr. Foster and then subsequently Mr. Penitani. The order certainly does but let me just make sure that I understand your reading of 1.7 if I could. 1.7a is what we're talking about and so do you do you read it to me you've said you don't read it to require concurrent clients. Correct. Right. That's correct. So is it your understanding then that that as to the former client Foster that there's a continuing duty? Is that that's how you read it? Absolutely. Okay if that's the case and it seems to me to be a certainly a fair reading and that's how I understand your briefing but then it seems to me to be that that situation that Mr. your argument is that Mr. Briner ought not have been able to assist Mr. Penitani in for example testifying before the grand jury in a way that was adverse to Mr. Foster is that right? That is correct. So once once Mr. Briner I we can accept that when he first engaged in his representation of Mr. Penitani he he he didn't necessarily know or at least that was the testimony that Mr. Foster to that point had not mentioned Mr. Penitani and Mr. Penitani at the outset had not mentioned his dealings with Mr. Foster. That became apparent and and and I understand your position though it seems to me to be that this because of this rule Mr. Briner's continuing duty to Mr. Foster should have materially limited his representation of Mr. Penitani but how did it after all he he represented Mr. Penitani when Mr. Penitani testified before the grand jury and and took the other steps he took. You're asking what was the adverse effect? I am. Okay the adverse effect really materialized itself at Mr. Penitani's sentencing. So there was there's a there's a few sort of concrete examples and they're not in the excerpts of record but they are in the district court record. Those are the steps you argue get your times ticking so I don't mean to interrupt but those are the steps you argue that he didn't the arguments he didn't make if I can some he did not fully group them together that way you think that the representation at sentencing ought to have been more aggressive and you've given some examples of that but how did those flow from how were they caused by what you argue is a continuing duty to Mr. Foster? Because he essentially was he was hiding basically his his prior relationship that he had with Mr. Foster like not not necessarily in an outright sense he didn't tell anybody about it but the only people who really knew about it were Mr. Briner and AUSA Thomas and there was no he didn't have that conversation with Mr. Penitani about hey I used to represent him now the information you've provided you've cooperated with has resulted in the superseding indictment in new charges and so he's not fully arguing the benefit that Mr. Penitani should receive for that cooperation. It is because he he testified unequivocally that he's he's protecting Mr. Foster's interest but now he has a client whose interests are clearly adverse to Mr. Foster's who's cooperating in the same case resulting in new charges and and this is the centerpiece of Mr. Penitani's cooperation is the information you provide is the only thing that resulted in new charges against anybody so it wasn't simply just a matter of hey you know I have this information it's there's the only thing that resulted in anybody getting any new charges and he didn't fully develop that in his memorandum. Well I guess the ethical rules to me are a little bit confusing in the sense that I know that there's a focus on that looking at as for violations of the ethical rules but in terms of when I put on my you know hat to analyze this I mean ordinarily a petitioner claiming IAC must show under Strickland deficient performance and prejudice but then Mickens describes an exception to this general rule where prejudice is presumed when there is an actual conflict of interest and so and the court just defined an actual conflict of interest to mean precisely a conflict that affected counsel's performance as opposed to a mere theoretical division of loyalties which is a two-step inquiry that a defendant must show a conflict of interest and the conflict actually affected counsel's performance. So while the ethical violations may have relevance here I don't think to me it's not the end of the story I still think we have to look at Mickens am I do you disagree with me on that? Mickens I don't disagree with that portion of your analysis with respect to Mickens which actually comes from Sullivan which actually originally comes from Strickland as well Strickland actually I mean I think the actual analysis is whether there's an actual conflict not whether he violated an ethical rule. That's absolutely correct okay and to show that actual conflict we have to show the adverse effect on on Mr. Briner's performance so kind of say going back to you Judge Christin there what's important to remember too is that Mr. Penatoni had a different judge a different sentencing judge then or different judge period than Mr. Foster and so it was incumbent upon Mr. Briner to educate Mr. Penatoni's judge with respect to all the cooperation that he did because that wasn't before the district court it wasn't before Mr. Penatoni's judge it was before a completely different judge and and when you look at the memorandum that he filed it it's it's just inadequate in every way with respect to doing that. Counselor your time is ticking so if I could interrupt and just ask you you mentioned a place where Mr. Briner makes a statement where he indicated that he was continuing to represent Mr. Foster's interests could you could you give me the ER site for whatever it is you're relying upon for the strongest showing of a material adverse impact on his representation. I oh he had you can submit that yeah I may have to submit that later. I I do know that he has yeah I mean he he he sort of came from the same stance as the district court in saying that listen I don't I didn't represent him anymore and so it just it didn't it didn't matters basically what he was trying to say and and actually I have that. I've got that okay so I don't want to take up your time. Okay okay so the bottom line is that he was there were things that was that's that's where the adverse effect came from. So how was he ever going to get under tenure minimum right? How was he going to? Yeah. Well that would have been up to the district court I mean he certainly could have and it didn't necessarily have to get under 10 he was you know what he ultimately got sentenced to was 14 years but the point is is that he actually did receive that downward departure from the court and he didn't but it could have been more especially given the fact that his counsel was asking for 24 months and so to justify that the only way he could was to show how much this cooperation against Mr. Foster meant but he's materially limited by what he could say about that because of his ongoing duty of loyalty to Mr. Foster. So that's that's where the real problem is in this case and that's where you know I would submit that Mr. Briner is probably incapable of knowing himself whether he's acting in Mr. Panettone's best interest or whether he's protecting Mr. Foster's interests. Those those two things just don't go hand-in-hand and and Mr. Panettone. His cooperation is defined by the debriefs that he went to and he testified at more than one trial I guess what the first one was a hung jury and then the second one was a conviction right and apparently he was intimidated at the first one or something and then they tried it again so I mean that pretty much you know how would how would that change I mean if that's what his cooperation is. I guess that I mean you can't make up things I mean he went to he went to debriefs first on his own then he went with counsel then he testified it during two trials I mean that pretty much says everything he did. I guess that statement would presume though that the lawyering has has nothing to do with the ultimate sentence that he receives and and that I disagree with respectfully because that's that's what his lawyers job is is to paint him in that light to paint the cooperation that he did in the best possible way for him to get the best possible sentence and the maximum amount of downward departure it's not simply this is what he did those are the facts so now make a ruling judge it needed to be developed and he couldn't do that because of his ongoing duty to Mr. Foster. So his Mr. Briner clearly didn't believe that he had an ongoing duty of loyalty to Mr. Panettone. He clearly didn't believe that. If he had an ongoing duty he needed a written waiver right? If he had an ongoing duty that fell within the framework of rules 1.7 1.9 he certainly would have needed a written waiver. Your position that it doesn't fall within the framework of 1.7? No your honor that's not my position. I take opposing counsel's point that 1.7 defines a client and there was a former client here. How is the duty clearly Mr. Briner didn't believe. Well if he filed let's assume he thought he violated some ethical rules how in your view do does the analysis of whether Mr. Miles Briner breached an ethical duty under Hawaii rules of professional conduct answer the question under Mickens? It doesn't answer it it might give you the first step but it doesn't get answer it because as you were just speaking to opposing counsel about there has to be a showing of adverse effects as a result of that. The reason that there couldn't have been an adverse effect here though was because Mr. Briner didn't believe that he had the type of duty of loyalty. It's not that he believed he had no duty of loyalty to Mr. Foster. He testified he did. My recollection is he testified flatly that he did without further explanation but what he believed was that under rule 1.9 these were not the drugs. That was his understanding. Let's talk about 1.7 because that's a lot stickier than 1.9. Well 1.7 does not it's 1.7 provides that the there is a concurrent conflict of interest if there's a significant risk that the representation of one or more clients would be materially limited by the lawyers responsibilities to in this case a former client. Incidentally a former client was actually added to that rule during the period of time this was going on. It became effective on January 1st of 2014. I don't think that has a real effect here because the representation of Mr. Panettone continued after that but the issue here is whether his duty to Mr. Foster was materially limited by his duty. I'm sorry his duty to Mr. Panettone was materially limited by his duty to Mr. Foster and because Mr. Briner didn't believe it was because he didn't think there was a problem assisting Mr. Panettone and testifying before the grand jury in a way it was materially adverse to Mr. Foster including it limit it led to additional charges counsel. There's no question it was adverse. There's no question it was adverse. There's no dispute about the fact that Mr. Panettone's position was adverse to that of Mr. Foster but Mr. Briner believed and I'm not taking a position on whether he was right or his duty of loyalty to Mr. Foster was limited to that narrow case that he represented Mr. Foster on and those drugs which were seized on February 14th of 2013. Even taking that even giving you that and I'm not sure that this matters a lot because we have a much bigger problem I think with prong two of Strickland but but even at that it's hard for me to imagine a scenario a universe where the testimony that Mr. Panettone gave was not adverse to Mr. Supplier. I fully concede that it was adverse. Fully concede that it was adverse. Of course it was adverse. The the question is though whether his his representation of Mr. Panettone was affected by his loyalty to Mr. Foster and it's pretty clear that it wasn't after all. That's the irony of it. It is very much the irony of it. After all... How could Mr. Panettone get under 10 years? What would have had to happen? Nothing that there was nothing that could have happened based on those facts unless the court simply believed that that that level of cooperation deserved that large a break and it would have been an enormous break. It would certainly would have been unlikely but the court does have a huge amount of discretion with respect to how much credit to give for cooperation. So what what would be Mr. Panettone's best argument of what he could have shown? What more cooperation? What would the court be looking at to see his cooperation? I mentioned the debriefs where he was unrepresented then he was represented. He did and so the court that sentenced him had two trials right to look at. That's right. And the grand jury testimony. And the grand jury testimony. Very significant cooperation and he got a very very significant reduction in his sentence. From a 360 to life down to 168 months is an enormous reduction and it was probably deserved. That's pretty significant cooperation. How many cases do you have in which defense counsel doesn't make any objection at all to the PSR? Personally probably a slight majority of significant number. I mean it's a little unusual. If you're advocating for a different sentence not to object to the PSR. It's it's fairly common though in this situation that it is a tactical decision whether you whether you nitpick about details in the pre-sentence investigation report that you don't think you can prevail on versus saying look how cooperative my client is and has been. He's not fighting about anything. He's putting himself on the mercy of the court. That's a tactical decision that Mr. Breiner apparently consciously made in conjunction with his client. Now we don't know. Well he testified that that he discussed it with Mr. Penatoni. Yeah. And and that's a that's a decision. So the bottom line. What didn't Mr. Penatoni some say that the only basis he had that he thought he could get what under 10 was kind of a look or something? Yes well his testimony is that in a in a early conversation with Mr. with AOSA Thomas he asked if he could get under 10 years and he got a slight nod from AOSA Thomas which the district court says she can't interpret what exactly that meant. And clearly everyone else's testimony was that Mr. Thomas never promised a sentence under 10 years or promised to recommend a sentence under 10 years. Obviously the the AOSA can't promise a sentence under 10 years since it's in the discretion of the court but he made it very clear and so did the other counsel who were present and the agents that no such promise was ever made. That it was the nod was that was what? That was the only thing that Mr. Penatoni was was hanging. I mean he had such a promise. So Mr. Hironaka in his argument focuses on Mr. Briner's failure to object to certain things in the course of the sentencing proceeding. But what he ignores is that Mr. Briner permitted or encouraged, we don't know what the backstory is, Mr. Penatoni to testify against Mr. Foster at both at grand jury and twice at trial. Clearly Mr. Briner was not acting in a belief that he needed to be so loyal to Mr. Foster that he couldn't represent Mr. Penatoni zealously. And the district court found that that that his representation that there was no evidence of of anything other than zealous representation of Mr. Penatoni. Do you agree that the district court's order treated 1.7 as though it requires concurrent clients? I don't think so. And the reason I don't think so, and I may not have looked at this quite as carefully as I might, but my understanding of her order is that she focuses first on the concurrent rule and points out concurrent. So concurrent obviously can mean two different things here, right? It can mean joint representation, representation of two clients at the same time, simultaneous representation, or it can mean the way the rule defines it, which includes a loyalty to a prior client. I'm referring to page 51, where she said that 1.7b applies only if there is quote a concurrent representation conflict. Sorry, I'm not finding that quickly. I guess more to the point, you answered my question earlier that you don't think 1.7 requires concurrent clients. Is that right? I think that's clear in the face of the rule. Thank you. Yes. I think that what the district court was doing was saying, first of all, during the period of both, there was no conflict. And then when she turns to the period of time after Mr. Briner learns that the two clients know each other, she doesn't make a finding as to whether there's an ethical violation. She doesn't make a finding one way or the other. What she does is she says, even if there were an ethical violation during that period of time, there were no adverse effects. And that if there are ethical violations, it could be relevant to adverse effect. But that the analysis has to be under Mickens, and then you have to find adverse effect. And that could be relevant evidence. But then there's other evidence, and your position would be that there was an adverse effect. There certainly weren't adverse effects. So what we're looking for here is an actual conflict of interest. Actual conflict of interest is defined in Mickens to include the adverse effects requirement. At least one of the opinions of this court says you need an actual conflict plus adverse effects. So that's a terminology difference with no substantive difference. Here, the question of whether there's an ethical violation helps us learn whether there is a conflict at all. But it doesn't help answer the ultimate question of whether there's an actual conflict in adverse effects. Thank you. Thank you, counsel. We'll give you two minutes for rebuttal. I just wanted to address a few points that were just brought up. So the first was Ms. Purcell basically arguing that Miles Briner didn't believe that he had an ongoing duty to foster. And so he was not violating that ongoing duty. That's in direct contradiction to his testimony. Well, but I think what counsel for the appellee or for the government said, I mean, if... Why would you... I mean, clearly recommending that Penatoni testify against Foster, that's certainly quite adverse to Foster, right? That is adverse. If you didn't... If you weren't really representing Penatoni, you know, zealously, why would you say if you were... If the concern is he was holding back because of Foster, it doesn't get any worse than that. It doesn't. But that's why the examples that I have with respect to the adverse effect go to his sentencing performance and his handling of the sentencing. And then, you know, Chief Judge Thomas also brought up these other things that may not necessarily be tied to his representation of Foster by his failure to object to the PSR. Ms. Nakamura testified, his... Mr. Briner's associate, that they didn't request a variance based on unprotected statements and relevant conduct. Well, and your experience, though, when people get consideration for their cooperation, isn't testifying against... In trial against someone one of the big gun because you can go to a meeting secretly and no one ever knows who, you know, dropped the dime on you. But you testify in open court, even at a grand jury, people don't know. But in open court, two different trials, and the defendant's sitting right there and you're sitting up in the witness stand, it's pretty hard to say you didn't say what you said. Oh, no, absolutely. And that's why that should have been page upon page in his sentencing memorandum. It should have been something that he was telling Judge Mulway, look, this is what my client did at great peril to himself. Counsel, what do we do... Forgive me for interrupting, but again, with the time constraint. Sure. What do we do about the fact that the AUSA who was present actually made this pitch to the sentencing judge? So, that's couched in his light. So, of course, he's recognizing Mr. Panettone's cooperation, that's fantastic, but it's still a skewed argument. He wants him to get it, but he wants him to only get as much as he wants him to get. And that's where Mr. Briner needed to come in with his follow-up memorandum and say, look, it's worth more than that, which he just jumps to this 24 months, but he doesn't tell the court why it should be going more than the 188 to 235, I believe, is what Mr. Thomas was asking for. So, while the court is aware of it, that argument needed to be better developed. That's a position that an argument basically... Well, but if his argument would be, you should get more weight and the impact in terms of the judge to look at what happened at the trial, what happened at the debriefs and all of that. So, I don't... What more, you know, could you do other than... I mean, he didn't say, oh, he didn't fall and say like, oh, yeah, give him what the prosecutor says. He said, no, it should get more, it's worth more. No, it's worth less, it's worth more, it's worth less. And then the court, you know, and you've probably noticed that judges don't always do what the judge says. I still believe in lawyering, though, and I still believe in advocacy, and that's a system that we have. And I think what we need to really remember, too, is what is critical is that there were two different judges here. So, what happened with Mr. Foster's case was not before Judge Malway. So, it was incumbent upon Mr. Briner to stress what happened before Judge Watson to Judge Malway because she wasn't there. Let's assume, for the sake of argument, that we have deficient performance at sentencing. Let's assume that there was a conflict at the time. What's your best evidence in the record that the two are correlated? That it was correlated? Yeah. The best evidence is that he actually was given a downward departure, that Mr. Briner was asked, thought, at least from his filings, that he believed it was worth so much more, that he believed it was worth 24 months sentence. And there's that gap there. There's this... The alternative theory is that he just didn't do a very good job and it was unrelated to the conflict. So, what's your best evidence, if there is any, in the record that the two are correlated? You know, it's... And I realize that this may not sort of be the best argument, but the violation of the rule sort of presumes that there's these problems. You know, that's why the rule is so artfully crafted. And I do think we do have to look, in part, to 1.9 because it does control a lawyer's obligations with respect to former clients. And so, when you have an attorney like Mr. Briner, who is essentially... He's violating this rule. He's basically gone to another client that's essentially in the same representation, and arguably the same case, and he's just moved on to represent somebody else who's cooperating against his former client, then it's... I think that's why, under the prejudice standard. And I think you might have touched on that a little bit, Judge Christin, is that it's... We're not necessarily strictly talking about Strickland. We're really within Sullivan here. We're talking about concurrent representation and that violation. So, the only thing that needs to be shown is adverse effect. The prejudice will be presumed if the adverse effect is shown. And to say that, you know, what Mr. Briner did is right or should stand, I don't think there's a lawyer who would agree with that, who would say that it's okay to represent client one, then move on to client two, who's cooperating against client one in the same case that client one has. It's a... That circles back to the conflict. So, is your answer to Chief Judge Thomas's question that the adverse effect is the failure to make a really obvious argument, like the failure to object to the PSR, as opposed to the outcome, the actual sentence? It's in part that. It's all the arguments he didn't make. And the case law talks about the things that the client, that, excuse me, the lawyer finds himself refraining from doing. I think that's, I believe that's a Ninth Circuit law. The arguments that weren't made and what's the other part of your argument? Do you think you can show that there was actually a change in the sentence? Or is it your position that you don't have to? No, that would be a prejudice standard. So, which doesn't... I just want you to answer the question because you're substantially over your time. I would say that there could have been a difference, yes, in his the way that they should have been made, to Judge Molloy. So, you think you've shown both? I'm just trying to get that. That's correct. Okay, thank you. Thank you very much. Thank you, counsel. Sorry for going over. No, no, no. That's our questions. That's what we're here for, to ask you questions. Thank you both for your arguments today and the case is arguably submitted for decision.
judges: Thomas, Callahan, Christen